1  LAW OFFICE OF STANLEY R. APPS
   Stanley R. Apps (State Bar No. 309425)
2  11818 Moorpark Street, Unit R
   Studio City, CA 91604
3  (310) 709-3966
   stan@appsatlaw.com
4
5  Attorney for Plaintiff Jesse Bengson

6

7

8                  **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10

11  JESSE BENGSON,                          )  Case No.:
                                            )
12                          Plaintiff,      )  COMPLAINT FOR:
               vs.                          )     1)  Discrimination on the basis of
13                                          )         disability,
    BOARD OF TRUSTEES OF THE CALIFORNIA )        2)  Harassment on the basis of
14  STATE UNIVERSITY, ELISA VELASQUEZ-      )         disability,
    ANDRADE, GLENN BRASSINGTON and          )     3)  Denial of reasonable
15  MATTHEW PAOLUCCI CALLAHAN,              )         accommodations of disability,
                                            )     4)  Retaliation for requesting and
16                          Defendants.     )         receiving reasonable
                                            )         accommodations of disability,
17                                          )     5)  Defamation per se,
                                            )     6)  Defamation
18                                          )
                                            )
19                                          )  JURY TRIAL DEMANDED
                                            )
20                                          )  INJUNCTIVE RELIEF SOUGHT
21  _____ )

22             **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

23         The Plaintiff, DR. JESSE BENGSON (hereinafter "Bengson" or "Plaintiff") hereby sues

24  Defendant, the Board of Trustees of the California State University, for discrimination and

25  harassment on the basis of disability, denial of reasonable accommodations of disability, and

26  retaliation for requesting and/or receiving reasonable accommodations of disability, in violation of

27  Title I of the Americans with Disabilities Act ("ADA"). Plaintiff further sues Dr. Elisa Velasquez-

28

                                       - 1 -

1   Andrade ("Velasquez-Andrade"), Dr. Glenn Brassington ("Brassington") and Dr. Matthew Paolucci

2   Callahan ("Paolucci") for defamation per se and defamation, including both libel and slander.

3   Plaintiff further states as follows:

4                                            **OVERVIEW**

5          For the first three years of Jesse Bengson's employment as an Assistant Professor of

6   Psychology at Sonoma State University ("SSU"), he received very positive feedback about his job

7   performance from all levels of review. After experiencing a recurrence of epilepsy in Fall 2017 and

8   receiving a disability accommodation for Spring 2018, Bengson became the victim of a campaign of

9   libel and slander waged by several members of his academic department including faculty and staff,

10  as well as several administrators, including an Interim Dean, the Vice President of Academic

11  Affairs, and the University Provost. This campaign developed, at least in part, as a form of

12  retaliation against Bengson because he had requested and received a disability accommodation. At

13  first, these individuals retaliated against Bengson by making untrue or exaggerated criticisms of his

14  teaching and service, including revising earlier, positive evaluations of his job performance.

15  However, the defamation became more sinister as members of the SSU faculty and administration

16  began to insinuate that Bengson's non-verbal mannerisms were evidence of his criminal nature and

17  intentions, when in fact these mannerisms derive from the fact that Bengson is deaf in one ear.

18  Bengson's partial deafness was common knowledge among members of the Psychology

19  Department. These individuals spread baseless rumors that Bengson would become a "campus

20  shooter" if denied tenure and promotion. As well as constituting defamation per se, these false

21  rumors also constitute harassment on the basis of Bengson's disability. In addition to justifying its

22  harassment with reference to mannerisms resulting from Bengson's partial deafness, the university

23  simultaneously discriminated and retaliated against Bengson for his disability accommodation. In

24  spite of Bengson's superior performance in both teaching and research, and adequate performance

25  in service, SSU unreasonably denied Bengson tenure and promotion. The harassment,

26  discrimination, denial of disability accommodations, retaliation and defamation have done

27  irreparable personal and professional harm to Bengson, whose promising career as a neuroscientist

28  and Psychology Professor has come to a standstill.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## PARTIES

1. Plaintiff Jesse Bengson is a natural person residing in this judicial district, who at all times relevant to this complaint has been employed as Assistant Professor of Psychology at Sonoma State University ("SSU"), which is a constituent campus of the California State University ("CSU").

2. Defendant, the Board of Trustees of the California University, is a governmental entity that controls and administrates all campuses of the California State University, including SSU.

3. Defendant Elisa Velasquez-Andrade ("Velasquez-Andrade") is a natural person employed as Chair and Professor of Psychology at SSU.

4. Defendant Glenn Brassington ("Brassington") is a natural person employed as Professor of Psychology at SSU.

5. Defendant Matthew Paolucci Callahan, known professionally as Dr. Matthew Paolucci ("Paolucci") is a natural person employed as Professor of Psychology at SSU.

6. Defendants Velazquez-Andrade, Brassington, and Paolucci will also be known collectively as the "Individual Defendants" or "Defamation Defendants."

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Plaintiff's claims, and is the proper venue, because these claims are brought under federal law and California law, and the conduct complained of took place in this judicial district. Furthermore, Defendants Velasquez-Andrade, Brassington and Paolucci reside in this judicial district and Defendant Board of Trustees maintains a continuous presence in this judicial district by controlling and administrating Sonoma State University and other CSU campuses within this judicial district.

8. Plaintiff filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission, which referred said charge to the United States Department of Justice for review and processing. On April 20, 2020, the United States Department of Justice issued a Notice of Right to Sue to Plaintiff, authorizing him to bring a civil action in

federal court within 90 days. A true and complete copy of the Notice of Right to Sue is attached hereto as **Exhibit A**.

## FACTS

*Bengson's first three years at SSU*

9.  Jesse Bengson was offered a position as Assistant Professor of Psychology at Sonoma State University ("SSU") in Fall 2015.

10. As a tenure-track employee, Bengson underwent a standard, six-year process that concluded with his application for tenure and promotion. Generally, when universities hire a tenure-track employee, these employees begin as Assistant Professors. During their first five years, they undergo annual evaluations that determine ongoing retention, followed by the sixth year application for tenure and promotion. If awarded tenure and promotion, they become Associate Professors and are awarded permanent employment with the university.

11. The annual evaluations serve to identify any red flags in teaching, research, or service, so that employees can address any problems during their probationary period. The sixth year application for promotion and tenure is evaluated by a series of Retention, Tenure, and Promotion (RTP) committees, beginning with the home department, then ascending by degrees through the college or school committee, the college Dean, a university-level committee comprised of professors from various schools, and finally the university Provost. The Provost, in consultation with the University President, makes the final decision about tenure and promotion. However, the departmental committee sets the tone of the entire process; the higher-ranked committees take their cue from the department's original recommendation for or against tenure and promotion.

12. For the first three years of Bengson's employment at SSU, he received very positive feedback about his job performance in annual evaluations produced by the Psychology Department and echoed by Provost Lisa Vollendorf (hereinafter "Provost" or "Vollendorf").

13. In Fall 2017, the Psychology Department's RTP Committee, chaired by Professor Heather Smith (hereinafter "Smith") published a performance evaluation commending Dr. Bengson for his excellent research, service, teaching, and particularly for his support of student research.

14. The RTP Committee, chaired by Smith, called attention to Bengson's outstanding scholarship; his creation of "unique and important opportunities for psychology majors"; and his impressive teaching skills, making particular note of Bengson's nomination for SSU's competitive "Excellence in Teaching" Award.

15. On June 11, 2018, SSU Provost Vollendorf echoed the department's positive third-year review of Bengson. Vollendorf commended Bengson for receiving unanimous praise from his department for his third-year performance review. According to Vollendorf, "[a]t all levels of review, the areas of teaching and scholarship are described as both commendable and impressive." Vollendorf's evaluation further notes that Bengson is "a reflective teacher who consistently focuses on improvement and incorporation of the valued teacher-scholar model at Sonoma State." Notably, Vollendorf made no suggestions that Bengson needed to improve his teaching or research, though she did state that she hoped Bengson would continue to expand his already-strong service record.

*Bengson Receives a Disability Accommodation for Spring 2018*

16. During Fall 2017, Bengson had a recurrence of an epilepsy condition that he had been diagnosed with prior to becoming employed at SSU.

17. During this same semester, Bengson had a grand-mal seizure in the kitchen of the Psychology Department. He fell and hit his head during the seizure, leaving a pool of blood on the floor. Because Bengson was disoriented after the seizure, he did not notice the blood, which was later discovered by Chair Velasquez-Andrade. At that time, Bengson informed Velasquez-Andrade about his epilepsy and the grand-mal seizure.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

18. Because managing stress is essential to controlling epileptic seizures, Bengson's medical team at Kaiser recommended that he request a work accommodation, which would allow him to reduce stress by avoiding in-person interactions with students and colleagues.

19. Following this advice, Bengson contacted Renee Senander, Manager of Worker's Compensation, ADA, and Leave Administration (hereinafter "Senander") to request a disability accommodation for the Spring 2018 semester. Senander served as a liaison between Bengson and Velasquez-Andrade. During November 2017, the three of them agreed on a reasonable accommodation to address Bengson's epileptic seizures during the Spring 2018 semester.

20. This accommodation relied in part on recommendations from Bengson's medical team at Kaiser. Senander summarized Kaiser's recommendation in an email she wrote on November 15, 2017: "Jesse has provided medical certification by Dr. Vanek outlining his temporary accommodation request for the Spring 2018 semester, which includes teaching and advising students online, as the essential functions of working in a group, multitasking, socializing, and excessive external stimulation are to be temporarily avoided."

21. In November 2017, Bengson was officially granted reasonable accommodations of disability, authorizing him to take the following steps to reduce stressors that could trigger epileptic seizures:

    a.   Teach his courses using alternate modes of delivery;

    b.   Advise his students via e-mail, telephone calls, and other modes of communication, rather than in person;

    c.   Withdraw from serving on a faculty search committee; and

    d.   Participate in faculty meetings remotely.

22. Because Bengson was deeply committed to his students, he chose to teach in person. However, he occasionally taught online, on days when he was experiencing an "aura," which is type of miniature seizure that can signal a forthcoming grand-mal seizure.

*Psychology Department RTP Committee retaliates against Bengson*

23. Shortly after Bengson received his accommodation, several of his colleagues began to fault Bengson retroactively for having under-performed during previous semesters. These colleagues also faulted Bengson for inadequate job performance during Spring 2018. They blamed Bengson for failing to engage in the specific activities precluded by his disability accommodation.

24. In May 2018, Heather Smith, Chair of the same RTP Committee that had commended Bengson's job performance in Fall 2017, sent Bengson an email allegedly representing the RTP Committee's perspective about his job performance. Smith acknowledged that it was unusual to communicate advice about the RTP process by email, but indicated she was doing so to honor Bengson's disability accommodation, which was intended to help him avoid in-person interactions. Notably, this was not a standard part of the RTP process, which allowed but did not require the candidate to seek such advice.

25. In her email, Smith revisited the RTP committee's previously glowing review of Bengson's Fall 2017 job performance. In an unusual move, Smith presented new claims to support her allegations that the RTP Committee had revised its views and now deemed Bengson's Fall 2017 job performance as inadequate.

26. In her unofficial, unauthorized email, Smith claimed that during Fall 2017, Bengson had lower-than-usual scores on his Student Evaluations of Teaching Effectiveness (also known as "SETEs"). Smith also expressed concern that these student evaluations contained some written comments that were critical of Bengson's teaching. In fact, Smith failed to mention that she was referencing only three negative comments about Bengson from his Fall 2017

- 7 -

SETEs. Drawing on these atypical comments, Smith sought to create an impression that Bengson's students were unhappy with his teaching. This impression was later invoked and repeated by a series of individuals and committees who were judging Bengson's job performance, and used as justification for denying Bengson tenure.

27. Notably, Smith's reference to these student comments did not appear in her official, Fall 2017 evaluation of his teaching, but only in the informal email sent in May 2018. Nonetheless, later evaluators faulted Bengson for failing to reflect on these student comments, even though they did not represent his consistently strong teaching record.

28. In Smith's informal email to Bengson, she herself acknowledged that Fall 2017 had been an "unusual semester" because of the Sonoma County wildfires that had resulted in campus closure. Even so, Smith blamed Bengson for the unusually low number of students who filled out SETE evaluations of Bengson during Fall 2017. Smith claimed that the low participation rate must have resulted from Bengson's failure to provide students with enough class time to complete the forms. In fact, the low completion rate more plausibly resulted from the wildfires and campus closures.

29. Smith is correct that an unusually low number of students completed SETEs for Bengson's Fall 2017 courses—likely due to the disruption caused by wildfires, which had displaced many SSU students. Of the 74 students enrolled in Bengson's courses during the Fall 2017 semester, only 22 completed SETEs. Smith is also correct in stating that Bengson's SETE scores were lower than usual during Fall 2017; however, she fails to state that the lower-than-usual scores occurred in only one of the three courses Bengson taught that semester. In that particular course, Bengson's average score was a decent but not spectacular 4.1 out of 5. However, in his two other Fall 2017 courses, Bengson's average SETE scores, respectively, were 4.5 and 4.6. These scores are on par with Bengson's usually impressive semester averages, which range between 4.5 and 4.75. Generally in the CSU, average SETE scores of

- 8 -

4.5 are considered evidence of strong teaching, and averages of 4.6 or above point to superior teaching.

30. Smith's May 2018 email further included an accusation that Bengson had failed to engage in a variety of activities during Spring 2018, even though his disability accommodation had relieved him temporarily of these duties. According to Smith, Bengson's inadequate job performance was demonstrated by his failure to perform the following activities:

    a.   Attend the Psi Chi Honor Society's induction ceremonies and graduation banquets;

    b.   Host "workshops, lectures, [and] awards ceremonies" for Psi Chi;

    c.   Offer "at least two hours of face to face appointments" each week with students;

    d.   Host "group advising during the heaviest advising times of the semester";

    e.   Attend the "faculty convocation, school meetings, department meetings, [and] the faculty retreat and commencement"; and

    f.   Participate effectively on the search committee from which the Chair had removed him due to his disability accommodation.

31. Smith's May 2018 critique represents a retaliatory re-evaluation of Bengson's job performance, entirely focused on faulting Bengson for failing to engage in activities precluded by his accommodation. It is only the first instance of retaliation directed at Bengson.

*Psychology Department Chair knowingly violates Bengson's disability accommodation*

32. Chair Velasquez-Andrade violated Bengson's disability accommodation during Spring 2018 by seeking to undermine its basic features. While the ADA requires a good-faith interactive process to determine reasonable terms of accommodation, once all parties agree to these terms, any new changes must be preceded by a new, formally announced interactive process.

33. In a manner inconsistent with the ADA mandate, Velasquez-Andrade asked Senander to reopen the interactive process in the middle of the Spring 2018 semester. Upon information

and belief, she did so because certain members of the Psychology Department were unhappy that Bengson was not attending faculty meetings and other departmental events in person. These individuals blamed Bengson for causing them to shoulder an increased load of departmental work.

34. In spite of the ADA mandate, Senander approached Bengson to renegotiate the terms of his accommodation. On February 28, 2018, Senander emailed Bengson to inform him that his accommodation was not set in stone. Senander referred to the interactive process required by the ADA to argue that Bengson would need to continue engaging in an "ongoing dialogue" about the terms of his accommodation. She did so without announcing a revised end-date for the initial accommodation or calling for a new interactive process.

35. In her email, Senander asked Bengson to begin informing the Chair by email each day he planned to teach remotely during Spring 2018, even though his accommodation allowed him to teach all his courses remotely if necessary. The Chair's request contradicted a November 20, 2017 email to Bengson, Velasquez-Andrade and others, in which Senander had confirmed granting a "reasonable accommodation to allow Jesse to teach courses remotely for the Spring Semester, including utilizing alternative methods to broadcast and teach your courses." In that earlier email, Senander had assured Bengson that he was "not required to be present on campus."

36. Senander's actions violated CSU Executive Order 1096, which makes clear that the interactive process to determine a reasonable accommodation must occur *before* the determination of said accommodation. Executive order 1096 states, "reasonable accommodations will be determined by the Campus *following* an interactive process with those involved." Velasquez-Andrade's attempt (via Senander) to renegotiate the disability accommodation while it was in effect also violated the ADA, because it had the effect of retroactively denying Bengson an accommodation of disability that already had been granted

- 10 -

and that Bengson was relying on to fulfill his job duties while struggling to manage his epilepsy.

37. In critiquing Bengson's unwillingness to renegotiate the terms of his accommodation mid-semester, Senander stated that Bengson "wanted the accommodation but not what it took to get the accommodation."  However, since Bengson had already been granted accommodations of disability, Senander's statement misrepresents both the facts and the applicable law.

38. Velasquez-Andrade further violated Bengson's accommodation by sending students to his office during Spring 2018 and instructing these students to request in-person meetings with Bengson, in direct contravention of disability accommodations that she knew of and had approved.  On one such occasion, the stress resulting from meeting with these students funneled to him by Velasquez-Andrade caused Bengson to experience a minor epileptic seizure in his office.

39. Other faculty in the Psychology Department, as well as administrators, critiqued Bengson for failing to engage in activities that his accommodation had excused him from, and used this failure repeatedly to justify negative performance evaluations and, ultimately, to justify denying him tenure.

40. Velasquez-Andrade further retaliated against Bengson by calling a meeting attended by herself, Bengson, Maureen Buckley, Interim Dean of the School of Social Sciences (hereinafter "Buckley" or "Interim Dean"), and Deborah Roberts, Associate Vice President of Faculty Affairs (hereinafter "Roberts" or "AVP Roberts").

41. During this meeting, Velasquez-Andrade complained that Bengson "wasn't doing his job" because he sometimes taught remotely and because he held office hours remotely.

42. Velasquez-Andrade also complained that Bengson had failed to show up for class on two sequential days in early October 2018 and had failed to notify the department about his absences in a timely manner.

43. Velasquez-Andrade must have known that on those particular days, Bengson was absent because of a severe head injury. On the Tuesday of that particular week, Bengson was hospitalized after being assaulted by a stranger with a socket wrench and steel Maglite 6-cell flashlight. On Thursday of the same week, Bengson was experiencing continued bleeding and confusion resulting from his head trauma.

44. Bengson did in fact file official absence reports on the two days he was absent. He also informed the department administrator, Cara Stevens, by email about his absence. However, he did forget to email the department Chair directly, likely as a result of his head trauma.

45. Describing this meeting later, AVP Roberts described Bengson as having become "red in the face" when the Chair confronted him with her accusations. Without any justification, Roberts claimed that Bengson's redness evidenced his "controlled rage" and violent tendencies.

46. Velasquez-Andrade continued to retaliate against Bengson by creating an atmosphere of resentment and blame directed at him for ostensibly failing to complete his work activities, even though his accommodation had excused him from said activities.

47. For example, during Spring 2018, Bengson attended faculty meetings remotely, per the terms of his accommodation. Velasquez-Andrade first tried to pressure Bengson into attending the meetings in person. When Bengson would contribute to the meetings by phone, Velasquez-Andrade would roll her eyes while he was speaking, as if to convey contempt for his absence to other Psychology Department faculty. Professor Laurel McCabe ("McCabe") noticed this pattern of behavior and believed that it must have caused some of

these faculty members to feel frustrated with Bengson, since they were not necessarily aware of his accommodation.

*Ongoing retaliation during Fall 2018*

48. The retaliation that Bengson experienced during Spring 2018 intensified during the two academic years that followed, 2018-19 and 2019-20, ultimately contributing to his denial of tenure.

49. As a tenure-track professor, Bengson reapplied for retention each Fall. In Fall 2018, just as Bengson was getting ready to submit his 4th year retention application, Velasquez-Andrade insisted that he attach a "Chair's Report" to the application. This demand violated the university procedure for submitting retention applications, a procedure outlined by the collective bargaining agreement governing SSU faculty.

50. In this Chair's Report, Velasquez-Andrade made false statements and criticized Bengson for failing to engage in activities precluded by his accommodation, including his failure to conduct in-person office hours and to attend faculty and other types of meetings in person during the Spring 2018 semester.

*Paolucci's Minority Report recommending against retention*

51. In response to Bengson's 4th year retention application, the Psychology Department's RTP committee gave Bengson a lukewarm vote for reappointment. While two of the committee members voted to retain Bengson, Paolucci, the committee Chair, voted against retention. He explained his reasoning in a retaliatory Minority Report that blamed Bengson for significant shortcomings in his teaching and service, particularly during Spring 2018.

52. In the Minority Report, Paolucci claimed that instead of an expected *progression* in teaching and service, Bengson's application for retention revealed "an *erosion* of progress." Paolucci simultaneously blamed Bengson for the increased "workload of an already taxed department" resulting from Bengson's temporary inability to be physically present for

certain departmental activities. Paolucci's report cites the "Chair's Report" as evidence for his claim that Bengson "shirked" his baseline responsibilities in the Psychology Department. However, the inclusion of said Chair's Report in Bengson's retention application represents a procedural violation of the RTP process. Therefore, Paolucci's reliance on it represents an additional violation of the collective bargaining agreement and of Bengson's due process rights.

53. In the Minority Report, Paolucci claimed that he had to "step in to remedy" problems caused by Bengson's so-called shirking of his duties. As an example of the "damage control" he had to engage in, Paolucci falsely claimed that was forced to replace Dr. Bengson as the Psi Chi Honor Society's faculty advisor. In addition, Paolucci falsely claimed that Bengson's alleged inaction jeopardized the Psi Chi Honor Society's charter. There is no evidence supporting this false claim.

54. Over time, Paolucci had consistently criticized Bengson for not attending Psi Chi's meetings and events in person even though this was part of his disability accommodation. Not only did Paolucci mention Psi Chi in the Minority Report, but he included additional complaints about this aspect of Bengson's service in an email he wrote on December 28, 2019.

55. In this December 28 email, Paolucci stated incorrectly that Bengson had threatened Psi Chi's charter status by failing to offer in-person guidance to its members during Spring 2018. In the same email, without any supporting evidence, Paolucci claimed that Bengson's failure to meet with students in person represented "withdrawal and non-verbal behavior" that was "hostile, inappropriate, and disruptive."

56. Paolucci concluded his Minority Report by stating that his "decision was in no way driven by any personal grievances against Dr. Bengson." One might think that as a Professor of Psychology, Paolucci might be aware that it is usually people with guilty consciences who

deny specific instances of wrongdoing when they have not even been accused of said wrongdoing.

_Recommendations against Retention by the Interim Dean and School of Social Sciences_

57.  The School of Social Sciences RTP Committee, as well as Interim Dean Buckley, both recommended against retaining Bengson for another year. In so doing, they echoed Paolucci's biased and retaliatory Minority Report, as well as Heather Smith's Spring 2018 email to Bengson (see ¶¶ 24-31 above).  The persons doing so should reasonably have known that their recommendations violated university RTP policy by relying on unofficial documents that were required to be excluded from RTP review.

58. This college-level RTP Committee claimed that Bengson's teaching record was inadequate, relying for their conclusions on the evaluation of data from Fall 2017 that Heather Smith had highlighted in the personal email she wrote to Bengson in May 2018. This same committee further echoed the departmental RTP committee's complaints that Bengson failed to engage in required activities, even though he had been excused from doing those activities because of his accommodation.

59. Interim Dean Buckley also recommended against retention, faulting Bengson for failing to reflect meaningfully on the cherry-picked student comments that Smith had invoked in her May 2018 email. In essence, rather than blaming Bengson for poor job performance, Buckley blamed him for not being "engaged enough with the RTP process." As evidence, Buckley claimed that Bengson had not meaningfully engaged with Smith's post-facto critique of his performance. This report not only was produced outside of the normal RTP process, but it relied on one set of uncharacteristic SETEs and three student comments. An accurate review of Bengson's teaching record at SSU reveals superior performance, supported by years of top-notch student evaluations, flawless peer evaluations, and an unusually strong record of supporting student research and professional success.

60. At the same time that Buckley recommended against retention, her letter praised Bengson for his "commendable" level of engaging students and identified an improvement in his SETE scores over time, belying the RTP Committee's inaccurate claim that Bengson's teaching had not improved over time. Buckley further noted that Bengson had provided "evidence of increased engagement in service" over time.

*Vollendorf revises her earlier commendation of Bengson's job performance*

61. In June 2018, Provost Vollendorf had praised Bengson's research, teaching, and service during the previous years. However, she made an about-face in her June 1, 2019 letter, which she wrote in response to Bengson's 4th year retention application.

62. In this 2019 letter, Vollendorf recanted her earlier praise of Bengson's teaching and service. Even though Vollendorf reappointed Bengson for an additional probationary year, she scolded him for failing to meet basic standards for teaching and service; for refusing to address "peer recommendations and student feedback" (again, the cherry-picked student comments); and for failing to "show improvement over time" in "areas of concern identified by the [departmental RTP] committee." Vollendorf's letter cites the minor and unsubstantiated critiques of Bengson's job performance first produced by Smith and then repeated by a departmental RTP committee intent on retaliating against Bengson for taking a disability accommodation.

63. With specific reference to Bengson's service, Vollendorf simply misrepresents the past. In June 2018, she encouraged Bengson to take on additional service at the university level, writing, "Your service has reached outward and involved numerous community events…I look forward to seeing an equally strong commitment to participation in university service." In response, Bengson did take on additional university-level service, in which he performed successfully. Surprisingly, in her June 2019 letter, Vollendorf claims that "Bengson's service "has been an ongoing problem in spite of many past suggestions for improvement."

*Ongoing retaliation against and defamation of Bengson beginning in Spring 2019*

64.  Beginning in Spring 2019, various faculty, staff members, and administrators began to engage in a more sinister form of retaliation against Bengson. Seemingly out of the blue, various individuals in the Psychology Department began to suggest the likelihood of Bengson becoming another "campus shooter" if denied tenure and promotion.

65. Each of these individuals flatly denied that Bengson had ever threatened them or anyone else, physically or verbally. Nonetheless, they began to spread rumors of Bengson's mental instability and potential violence, justifying these rumors with reference to Bengson's body language, voice volume, and facial expressions. These individuals concluded that Bengson's mannerisms reflected his violent intentions.

66. The rumors and accusations against Bengson are strongly reminiscent of the medieval witch hunts in which individuals in power interpreted non-verbal expressions and movements in fantastical ways, imputing evil intentions to the victims and normalizing the imputations through repetition. It is not coincidental that the individuals who circulated false and exaggerated allegations about Bengson's threatening posture and facial expressions are the same people who retaliated against Bengson for taking a disability accommodation. Notably, the rumors about Bengson's violent tendencies only began to circulate after he received a disability accommodation.

*Velasquez-Andrade's unfounded fear of Bengson*

67. In Spring 2019, Chair Velasquez-Andrade developed some new habits in response to her self-described fears about Bengson's capacity for future violence based on his mannerisms and body language. However, she must have been aware on some level that her fears were unfounded, since she later told an Investigator employed by the university that Bengson had never threatened her in any way, and, on another occasion, asserted to a staff member that Bengson's mannerisms were harmless.

68. As Velasquez-Andrade later told the Investigator, in Spring 2019 she removed all the knives from the kitchen of the Psychology Department for fear that Bengson might use them on her. At this time, however, Velasquez-Andrade did not report her alleged fears to the university.

69. When Bengson rejected a student who was applying to work in his lab because of the student's inadequate command of English, Velasquez-Andrade met with Bengson to discuss the incident. A Title IX investigator also attended the meeting. Later, Velasquez-Andrade asserted that Bengson became defensive during the meeting, exhibiting "very primitive" behavior, and "bending down and not blinking…like an animal threatening its prey." At the time, however, the Chair did not report this ostensibly threatening behavior to the university. Likewise, the Title IX investigator did not report any such behavior.

70. The Chair later claimed to multiple individuals that Bengson's mannerisms led her to become "hypersensitive to the noises in the office"; to put "an attachment on her door to block the light out, so no one knows when she is inside"; and to start "carrying pepper spray and a large umbrella for some sense of protection when she leaves campus."

71. When interviewed about these incidents, Chair Velasquez-Andrade justified her fear by claiming expertise in reading non-verbal body language. The Chair claimed that her work with infants caused her to be "hyper-sensitive to all body language and facial expressions." Relying on this expertise with infants, Velasquez-Andrade concluded that Bengson's body language signified his intent to harm others.

72. Nonetheless, when a staff member (reportedly) confessed to feeling unnerved by Bengson's body language, Velasquez-Andrade did not cite this expertise with infants to claim that Bengson was a violent predator. Rather, Velasquez-Andrade reassured the staff member that leaning forward was "a common way for Bengson to sit." In other words, the Chair's response reveals her awareness that Bengson always sits in the same way, whether he is

- 18 -

neutral, happy, angry, defensive, or otherwise, and that his manner of sitting was not a reason to fear him.

73. Nonetheless, the Chair later claimed that she felt threatened by Bengson during faculty meetings because he "leaned in" and "stared" at his colleagues.

*The effect of partial deafness on Bengson's mannerisms and body language*

74. Because of his partial deafness, Bengson commonly angles his body when listening to others, so that his good ear faces his interlocutors. Likewise, particularly in group settings, Bengson leans forward and focuses on his interlocutors so he can concentrate on what they are saying. Bengson has made his colleagues aware of his partial deafness, in order to explain to them why he sometimes has trouble understanding their words or why he sometimes needs for statements to be repeated in order to understand.

75. Moreover, as Professor McCabe has noted, because of his partial deafness, Bengson is not always aware of how loudly he is speaking, which might have led some interlocutors to perceive Bengson as raising his voice when he was not doing so out of anger or aggression.

76. During the coronavirus pandemic, Bengson has found it particularly difficult to understand other people while they are wearing masks, making him more acutely aware than before of the degree to which he relies on lip-reading. If he stared intently at colleagues in group settings, it is more likely that he was focusing on what they were saying than that he was seeking to harm them. Projecting assumptions about someone's affect, which has directly resulted from their disability, is an egregious forms of disability discrimination. In Bengson's case, these projections were used inaccurately to evaluate his job performance and subsequently to deny him tenure.

77. In contrast to these projections, Bengson has never given Velasquez-Andrade or anyone else any reason to think that he suffers from mental instability or violent tendencies. Evaluations of Bengson from students, as well unbiased colleagues, describe Bengson as a friendly,

- 19 -

pleasant, and engaged individual; a tireless supporter of his students; and a brilliant neuroscientist. There is no plausible evidence whatsoever to support the repeated assertions that Bengson is a potential "campus shooter." Instead, these assertions constitute the most vicious and unfounded type of per se defamation.

*Demonization of Bengson by SSU staff and administrators*

78. On December 5, 2019, university counsel hired Chrystine Watson ("Watson") to conduct a confidential investigation into Bengson's allegedly inappropriate and unprofessional behavior. The transcripts of Watson's interviews with the involved parties reveal the elements of a witch hunt through which SSU professors, staff, and administrators engaged in harassment and retaliation against Bengson by defaming his character, and then justifying their defamatory statements with reference to mannerisms associated with his partial deafness.

79. In an interview with Watson, Maureen Buckley stated that in late June or early July, 2019, Buckley was walking across campus with Bengson and his two young children when Bengson announced that he liked to shoot the heads off of bunnies. Buckley also stated that Bengson made this confession while staring at Buckley with a challenging and intense gaze. Buckley claims that after Bengson's confession, she asked if he owned guns, to which he allegedly responded that he "owned guns and knew how to use them." Notably, Bengson denies having had this conversation, though he admits to having discussed hunting in general with SSU colleagues. Bengson grew up on tribal land in North Dakota and has hunted since he was five.

80. Buckley simultaneously reported having had several deep and pleasant conversations with Bengson. She further stated that she had never felt "threatened personally" by Bengson nor had she perceived any "imminent threat of danger" from him. Buckley did state that she could imagine someone feeling threatened by the way Bengson's "body posture moves

forward towards you" or the way he "stares." As stated above, leaning forward and lip-reading are mannerisms Bengson uses to compensate for his deafness in one ear when in group settings.

81. On November 20, 2019, Bengson came to the Dean's office after discovering that he would not have a lab space in the temporary building being used by the Psychology Department while its permanent location was under construction. On that day, Bengson met with Buckley, as well as Karen Leitsch, the Administrative Manager of the School of Social Sciences (hereinafter "Leitsch").

82. In a letter describing this November 20th meeting with Bengson, Leitsch confessed to having upset Bengson because she blamed him for being cavalier during the pre-move planning: she told Bengson that unlike other professors in the department, he had not been proactive about what he might need in the temporary building.

83. In a subsequent written complaint about Bengson, submitted to AVP Deborah Roberts, Leitsch claimed that during the November 20th meeting, Bengson had acted in an aggressive and threatening way towards her. Yet the only evidence Leitsch offered was that Bengson told her the two of them had "had a problem communicating." As additional evidence, Leitsch noted that Bengson "was getting really red in the face" during their interaction.

84. Leitsch later told Watson that in their second interaction on the same day, Leitsch asked Bengson why he had not stated his need for a lab more aggressively. In response, Bengson purportedly "almost shouted" that he had not done so because he was not yet tenured and he did not want to seem too aggressive. According to Leitsch, Bengson then placed his fist on her desk, stated that they had "had a miscommunication," and left. Leitsch concluded that she had felt threatened by Bengson during this conversation because of Bengson's "body posture," the "tone of their voice," and the "gut feeling like you aren't safe around them."

PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

85. Viri Ruiz, Operations Coordinator in the Office of the Dean, had a desk situated right outside Leitsch's door. Ruiz told Watson said that she was at her desk during the interactions between Leitsch and Bengson and did not hear any banging fists or outbursts on Bengson's part. Moreover, Ruiz reported that after Bengson left, Leitsch was visibly upset but not scared or crying. Nonetheless, Leitsch reported the incident to the university, claiming that Bengson had made her feel scared for her life.

86. Bengson also discussed the lab space issue with Buckley on the same day. Buckley reportedly later told AVP Roberts that Bengson had become very upset and red in the face during their conversation. Buckley offered no evidence of aggressive or violent behavior.

*Three-Week Suspension with Pay*

87. Following the November 20th incidents, Roberts placed Bengson on a temporary (three-week) suspension with pay, with the explanation that several SSU employees had complained that Bengson "made aggressive movements and threats of further aggression when in the Office of the Dean."

88. This notice of suspension incorrectly stated that Bengson told staff in the Psychology Department that he owned guns and knew how to use them, when in fact this was an allegation made by Buckley. This notice of suspension without pay also claims that on November 20th, Bengson yelled, banged his fist, and shoved a chair while in the Dean's office, though none of these details comport with the incidents as described by the involved individuals (see above, ¶¶ 79-84). The suspension notice further stated that Bengson's behavior in the Dean's office was consistent with a "pattern of aggression, agitation, and unprofessional conduct" that left members of the SSU community "feeling unsafe and threatened." Again, no evidence supports these claims.

*Watson's Investigation of allegations against Bengson*

89. Transcripts of Watson's investigation confirm that beginning in Summer 2019, Bengson's detractors began to circulate exaggerated descriptions of his mannerisms and non-verbal behavior, behavior that can be attributed to his partial deafness.

90. These individuals also circulated an invented narrative suggesting that Bengson was a dangerous and mentally unstable individual who, if denied tenure, was likely to take violent revenge on SSU staff, faculty, and administrators. Notably, Bengson has since been denied tenure and is in the process of taking legal action, *not* vigilante action, in response to his dismissal.

91. Every SSU employee whom Watson interviewed, including those who had circulated defamatory slurs about Bengson's propensity for violence, also insisted that Bengson had never threatened them physically or verbally in any way.

92. Watson's report, completed on February 12, 2020, reveals that, beginning in 2019, several of Bengson's colleagues began circulating false narratives that Bengson acted in an aggressive and threatening manner with colleagues. These individuals even revisited and exaggerated minor workplace disagreements from early in Bengson's time at SSU in order to create the impression that Bengson's aggression had been an ongoing pattern over a long period of time.

93. One such incident occurred in 2015, when Bengson first started working at SSU. Bengson allegedly became angry at Cara Stevens, a Psychology Department Administrator, when some computers he ordered did not arrive on time. At the time, Stevens reported the incident to Leitsch. Professor McCabe witnessed the incident, and told Watson that she noticed Bengson's frustration at the time because of the "tightness in his body and voice." However, McCabe also reported that Bengson's reaction did not go beyond the "boundaries of discomfort." According to McCabe's testimony, Bengson's reaction evidenced that he was managing his anger rather than acting it out in a threatening manner.

94. McCabe also told Watson that she has never seen Bengson demonstrate any aggressive or inflammatory behaviors, nor has she seen him display an angry or threatening demeanor towards colleagues or students. Aware that Bengson is deaf in one ear, McCabe did suggest that Bengson seems to favor one side when speaking and listening, and that he sometimes fails to register how loudly he is speaking.

95. Watson's treatment of McCabe's testimony points to her bias as an Investigator. Watson dismissed McCabe's testimony by claiming that McCabe is a "self-professed supporter of Bengson." It seems that Watson only trusted reports about Bengson when they came from his detractors. Her automatic disqualification of anyone supportive of Bengson is an explicit demonstration of bias.

96. Though Cara Stevens had been upset about this incident when it happened back in 2015, she told Watson that, since then, she has interacted with Bengson on a weekly basis; that they had a "great rapport"; and that she never witnessed any other incident that reflected negatively on Bengson.

97. Nonetheless, in a written follow-up to her interview with Watson, Stevens confessed that in 2019 she began to feel afraid of Bengson. Stevens attributed this fear not to Bengson himself, but to American culture in general. Elaborating, Stevens described her fear as "a general concern that every school and government employee has in this day-and-age…there's that fear that he'll feel like he's been backed into a corner and with nothing to lose, decide to come to campus and exact such revenge."

98. By making this statement, Stevens was projecting a potential for violence onto Bengson despite the facts and her consistently positive experience working with him. Stevens' comments turn Bengson into a scapegoat, because she made him responsible for her own, non-specific fear about disgruntled employees who resort to criminal violence when things are not going their way. Stevens' explanation offers insight into the seemingly viral spread

- 24 -

of rumors about Bengson among some of his SSU colleagues, who likewise projected a
potential for violence onto Bengson, despite the total absence of plausible evidence.

99. As Watson's investigation revealed, Leitsch was particularly guilty for spreading
exaggerated rumors about Bengson. Immediately after her November 20th interaction with
him, Leitsch described the encounter in a letter. In this letter, Leitsch claims that Bengson
said he not been more aggressive in asking for temporary lab space because he was not yet
tenured and did not want to appear overly demanding.

100. Upon information and belief, after she made a formal complaint to AVP Roberts about the
November 20th incident, Leitsch began circulating alternate versions of Bengson's
statement. In these rumors, Leitsch twisted Bengson's words to suggest that what he really
meant was that once he got tenure, he would reveal the true extent of his violent tendencies.
For example, upon information and belief, Leitsch told other SSU colleagues that Bengson
said he had not been more aggressive about the temporary lab space because people were
conspiring against him, but that once he got tenure, "things are going to change and the
truth will come out."

101. In addition to circulating distorted narratives about what Bengson said, Leitsch cast further
doubt on Bengson's character by echoing the rumor that his potential for violence was
demonstrated by his manner of sitting, with his "forearms resting on his thighs and his body
leaning forward in a tense fashion."

102. Leitsch also justified her fear of Bengson by claiming that Bengson's lab space was
disturbing and gave her a "strange feeling" because it was less like a typical office and
"more like a lounge with soft lighting."

_Defamation of Bengson's character by Brassington, Paolucci, and Velasquez-Andrade_

103. Upon information and belief, beginning in Spring 2019, Brassington, Paolucci, and Velasquez-Andrade began to speculate to each other and third parties that Bengson was a potential campus shooter.

104. Psychology Professor Glenn Brassington (hereinafter "Brassington") told Velasquez-Andrade, "I hope we don't have an active shooter situation with him." When questioned by Watson, however, Brassington revealed that he had no evidence to support this claim. Brassington told Watson that he had never heard Bengson raise his voice; that he had never made a formal complaint about Bengson; and that he had not kept any written notes documenting any unprofessional or aggressive behavior exhibited by Bengson.

105. Nonetheless, Brassington began circulating rumors about Bengson's purportedly aggressive behavior. These rumors concerned episodes that Brassington had heard about but had not witnessed first-hand.

106. In spite of assuring Watson that he had never seen Bengson act aggressively with him or anyone else, Brassington claimed he was afraid of Bengson because of the "culmination of Bengson's behaviors." These alleged behaviors include Bengson's purported failure to respond to "simple hellos" in the hallway. Even if true, Bengson's failure to say hello might have been the result of his partial deafness, which makes it difficult to hear people in crowded environments such as hallways.

107. Brassington told Watson that Bengson had created an "unsafe environment" at SSU. As evidence, Brassington said that Bengson would often "smirk, stare coldly, raise his eyebrows and smile in a condescending fashion." Immediately after making this statement, Brassington complained to the Investigator that Bengson's disability accommodation had created more work for Brassington.

108. Like Brassington, Paolucci claimed to feel afraid of Bengson's future potential for violence, even though Paolucci emphatically assured Watson that Bengson had never threatened him verbally or physically in any way.

109. Paolucci's expressed fear of Bengson is so extreme and unsubstantiated that his confessions arguably point to Paolucci's own mental instability. For example, Paolucci refused to meet in person with the investigator, claiming that simply receiving the emailed request for an interview caused him to experience "shortness of breath, pressure in chest, shaking." Instead of meeting in person with Watson, Paolucci emailed her answers to her questions.

110. In two separate emails to Watson, Paolucci confirmed that Bengson never "directly threatened me to my face," nor was ever "overtly threatening in my presence."

111. However, Paolucci cited his own research into aggression to suggest that Bengson could be a potential serial killer. In an email to Watson sent on December 27, 2019, Paolucci wrote, "As I said before, has he ever been overtly threatening in my presence? No. But neither were those who ultimately committed violent acts in the workplace. As a social psychologist with expertise in aggression, I know the research on risk factors for potential violence—alienation, sense of entitlement, failure, masculinity, projection (everyone is the problem). This, with the escalation behavior is why this has caused me such distress that I have sought therapy for the first time in 20 years."

112. Comparing Bengson with serial killers from the past, Paolucci said that Bengson's rebuttal to an RTP evaluation sounded like a "manifesto" and made him feel that his "safety was in jeopardy." When Watson pressed him to elaborate on his reasoning, Paolucci had to admit that "it was nothing directly written in the document that made me feel unsafe." Instead, Paolucci argues, "it was the tone of contempt, and that it was just so out of established norms."

113. Paolucci's exaggerated reaction to the rebuttal is confusing, since Bengson was simply providing extensive evidence to challenge Paolucci's false claims about his job performance.

*Bengson's Anonymous Letters*

114. While Watson was still conducting her investigation, Bengson felt increasingly scared that the continued defamation of his character would cause him to lose his job. In January 2020, while Bengson was suspended with pay, he sent three anonymous letters to Leitsch, Viri Ruiz, and Julie Wood, three SSU employees associated with the School of Social Sciences.

115. On April 30, 2020, Bengson received another disciplinary action in the form of three weeks of suspension without pay.

116. By mailing these letters during the period when he was suspended with pay, Bengson did violate the injunction that he refrain from contacting anyone at SSU during the suspension. The letter does not, however, evidence Bengson's intent to do violence. On the contrary, the letter points to Bengson's status as a victimized person. When he wrote this letter, Bengson was deeply distraught because certain SSU employees had defamed him and spread rumors about his potential to be a "campus shooter." He feared that these same employees might be willing to perjure themselves as continued retaliation against him for his disability.

117. Bengson has stated that he sent the letters with the intent of informing these staff members of existing laws and consequences relating to perjury as he understood them. Based upon that understanding, his letters inform these three recipients that they "will likely have to testify in court" and stress that it is a felony under California law to "give false information," especially "when testifying in court" and "when being deposed." Notably, his assertions simply set forth Bengson's beliefs as to the content of California law. They are not threats, retaliatory actions, or false allegations.

118. Bengson's anonymous letters represent a desperate plea for members of the Psychology Department to refrain from continuing to defame and demonize him. The letters reflect the

psychological state of someone who has been victimized, *not* someone with plans to victimize others. And even though Bengson was victimized, never did he exhibit any indication that his victimized status might result in a violent retaliation. In fact, the very people who have claimed to be afraid of Bengson repeatedly stated, in their conversations and emails with Investigator Watson, that he neither said nor did anything to indicate any plans to respond with violence.

119. SSU President Judy Sakaki (hereinafter "Sakaki") harshly reprimanded Bengson for sending the letters, stating that he had engaged in retaliation and witness intimidation, as well as a "failure and refusal to perform [his] normal and regular duties." However, by the time Bengson sent these letters, his actions speak to his status as the victim of sustained attacks on his character by SSU employees.

*Continued retaliation against Bengson resulting in tenure denial*

120. By the time Bengson applied for tenure and promotion at SSU, in Fall 2019, he had been subjected to ongoing retaliation for taking a disability accommodation. The SSU colleagues engaged in this retaliation both by misrepresenting Bengson's job performance, by slandering his character, and by creating a false narrative about the likelihood that he would retaliate violently against SSU employees if denied tenure. This false narrative relied on demonization of Bengson based on his partial deafness and associated mannerisms.

121. The various committees who evaluated Bengson's application for tenure expressed their unfounded bias against him by claiming that he demonstrated unsatisfactory job performance in teaching and service.

122. To be awarded tenure in the CSU, an applicant must demonstrate excellent marks in at least two of the three categories (teaching, research, and service).

123. The Psychology Department's RTP Guidelines are straightforward in identifying teaching as the most important element of the RTP application. The department's RTP guidelines include

a long list of categories that the department uses to judge a candidate's teaching. In the most highly-valued of these categories, Bengson exceeded the standard for excellence.

124. The departmental RTP Committee retaliated against Bengson, recommending against tenure, because he took a disability accommodation during Spring 2018. The committee overlooked ample evidence of Bengson's top-notch performance in teaching and scholarship, and instead focused on his failure to excel in one or two categories, which are clearly identified as secondary concerns in the departmental RTP guidelines for evaluating teaching.

*The Departmental RTP Committee misrepresented Bengson's teaching record*

125. In his application for tenure and promotion, Bengson demonstrated excellence in teaching by providing evidence in the form of Student Evaluations of Teaching Effectiveness ("SETEs"); written student and peer evaluations of his teaching; development of new courses; nomination for a competitive teaching award; and support for student research that went above and beyond the norm.

126. However, in contrast with its normal practice, the departmental RTP committee focused almost exclusively on Bengson's failure to address "peer recommendations and student feedback."

127. For example, the committee undermined the positive peer evaluations included in Bengson's application packet. They did so by faulting Bengson for not responding to his peers' suggestions for improvement. However, Bengson did not respond to suggestions for improvement because his peer evaluators did not make any suggestions for improvement.

128. The committee then implied that Bengson's most recent peer evaluators were inadequate because they were not members of the Psychology Department. However, in previous evaluation cycles, Bengson had received positive evaluations from members of his department. When he requested that one of these professors evaluate him again for his tenure file, she responded that it would be better for him to include evaluations of his teaching from

a wider range of professors. After unsuccessfully requesting to be evaluated by two different Psychology professors, Bengson reached out to professors from other departments to evaluate him.

129. Finally, the departmental RTP Committee blamed Bengson for the fact that his evaluators emphasized the positive elements of his teaching (such as "active learning" and "interactive discussion"). The committee responded to these positive evaluations by claiming that the evaluators should have instead offered "information in terms of targeted improvements to address deficiencies from the previous evaluation cycle." In other words, the committee tried to make Bengson responsible for what his evaluators said about him, criticizing Bengson for that fact that his evaluators had been overly positive. This is patently unfair and unreasonable and demonstrates explicit bias.

130. The RTP Committee further argued that Bengson failed to meet the Psychology Department's criteria for tenure because his teaching did not "show improvement over time." This statement is simply untrue and is contradicted by evidence that Bengson included in his application for tenure.

131. An example of such evidence are Bengson's Spring 2019 SETEs, which speak to his excellent teaching. For the three courses that Bengson taught in Spring 2019, his average SETE scores were superior: 4.46 (PSY 446); 4.59 (PSY 415); and 4.75 (PSY 280), with 5 being the highest possible score.

132. Bengson's detractors note that some students complained about his failure to provide a study guide for their cumulative final exam. However, what these critics do not say is that instead of a formal study guide, Bengson shared his own Power Point presentations with the students and encouraged students to use these slides in preparing for the final exam. While some students did indeed complain about the lack of a study guide, almost the same number of

students praised the Power Point presentations. As one student explained, the slides "covered

the material on the exam in depth."

133. Some disagreement about an individual professor can be expected on SETEs, since there are

many different kinds of students with different expectations. While some students did

complain about the lack of a study guide and about a "high-stakes" final exam, just as many

students praised Bengson for providing good study materials, and also for final grades

resulting from assignments that were "evenly distributed throughout the semester."

134. Just as the committee had done in its 4th year review of Bengson, it focused on a small

handful of negative student comments. However, a numerical calculation of all student

comments from Bengson's three Spring 2019 courses reveals the following:

    a.   21 students praised the high quality of Bengson's lectures and in-class discussions

    b.   11 students praised Bengson's online Power Point presentations

    c.   13 students critiqued the lack of a cumulative study guide

    d.   1 student complained about a change in due dates

135. The departmental RTP committee also justified recommending against tenure because of

Bengson's alleged failure to "show improvement over time for any areas of concern

identified by the committee." However, the committee was referring to "areas of concern"

that they had identified during Spring 2018. These areas of concern were actually the

activities from which Bengson was excused, per the terms of his disability accommodation,

demonstrating once again that discrimination and retaliation against Bengson for his need for

and use of disability accommodations was the true basis for denial of tenure and promotion.

## COUNTS

### COUNT ONE: DISCRIMINATION ON BASIS OF DISABILITY
### (AGAINST DEFENDANT BOARD OF TRUSTEES OF THE CALIFORNIA STATE
### UNIVERSITY ONLY)

136. Plaintiff hereby reincorporates and realleges paragraphs 1-135 hereinabove, as if fully set forth herein.

137. The Board of Trustees of the California State University ("CSU") is an employer subject to the requirements of Title I of the Americans with Disabilities Act ("ADA").

138. The Plaintiff, Jesse Bengson, suffers from multiple conditions that limit multiple major life activities, including epilepsy and deafness in one ear. Bengson's co-workers and employer are aware of and/or have been informed of and should have been aware of his disabling medical conditions.

139. Defendant CSU is an employer who employed Plaintiff and knew of Plaintiff's disabilities.

140. Plaintiff was able to perform the essential duties of his job with reasonable accommodations, which, during Spring 2018, allowed him to avoid in-person meetings with students and other faculty, so as to avoid stress that might lead to epileptic seizures.

141. Defendant CSU subjected Plaintiff to multiple adverse unemployment actions, including:

    a. Revisiting glowing evaluations of Plaintiff's job performance that were produced before Spring 2018, to newly suggest that the Plaintiff had in fact underperformed at his job;

    b. Critiquing Plaintiff's job performance because he was performing his job duties differently during Spring 2018, in spite of the fact that these differences had been authorized by Plaintiff's disability accommodation;

    c. Plaintiff's department Chair asserted to colleagues that Plaintiff was shirking his job duties because he was attending faculty meetings remotely, even though she knew of and approved of his disability accommodation, and his accommodation specifically allowed for remote attendance of said meetings;

    d. Chair pressured Plaintiff to renegotiate the terms of his accommodation halfway through the Spring 2018 semester; and

e.   Defendant CSU, by and through Senander, attempted to force Bengson to re-negotiate his disability accommodations mid-semester, prior to the agreed date when his accommodations were due to be re-evaluated and during the period when the previously approved accommodations were in effect, without formally announcing the end of the current set of accommodations and a new interactive process. Senander's actions had the effect of retroactively denying Bengson an accommodation of disability that had already been granted and that Bengson was relying on to fulfill his job duties while struggling with his epilepsy.

142. In addition, Defendant imposed an unjustified three week suspension on Bengson.

143. Ultimately, Defendant denied Bengson tenure and promotion, which will necessarily lead to termination of Bengson's employment.

144. Plaintiff's disability was a substantial motivating reason for the adverse employment actions, as demonstrated when:

a.   Bengson's colleagues expressed anger and resentment against Plaintiff because the accommodation of his disability allegedly resulted in their own increased workload; and

b.   Defendants used the Plaintiff's alleged failure to perform actions from which he was excused by his disability, as justification for creating unsubstantiated critiques of Plaintiff's job performance, ultimately resulting in denial of tenure and promotion.

145. Plaintiff was harmed by Defendant CSU's conduct, including emotional distress, humiliation, fear, loss of self-esteem, current and future financial losses, loss of career prospects and loss of career.

146. The fact that Plaintiff has been denied tenure will make it nearly impossible for him to secure another tenure-track position.

## COUNT TWO: HARASSMENT BASED ON DISABILITY

## (AGAINST DEFENDANT BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY ONLY)

147. Plaintiff hereby reincorporates and realleges paragraphs 1-146 hereinabove, as if fully set forth herein.

148. The Board of Trustees of the California State University ("CSU") is an employer subject to the requirements of Title I of the Americans with Disabilities Act ("ADA").

149. The Plaintiff, Jesse Bengson, suffers from multiple conditions that limit multiple major life activities, including epilepsy and deafness in one ear. Bengson's co-workers and employer are aware of and/or have been informed of and should have been aware of his disabling medical conditions.

150. Defendant CSU employed Plaintiff and knew of Plaintiff's disabilities.

151. Plaintiff was able to perform the essential duties of his job with reasonable accommodations, which, during Spring 2018, allowed him to avoid in-person meetings with students and other faculty, so as to avoid stress that might lead to epileptic seizures. Specifically, Plaintiff's temporary disability accommodation allowed Plaintiff to meet remotely with students and colleagues, and to teach remotely if necessary, something that Plaintiff only did on days when he was experiencing an "aura" that could signal a forthcoming grand mal seizure.

152. During the period of accommodation, Plaintiff continued to teach, do research, and perform service with the same effectiveness and high quality as he had demonstrated previously.

153. Plaintiff faced a hostile work environment, including:

    a.   Defendant CSU's employees repeatedly asserted, despite the absence of any plausible evidence of their claims, that Plaintiff was a potential campus shooter who intimidated and terrified them by such everyday actions as leaning forward and listening intently;

b.  Defendant CSU failed to take reasonable efforts to stop the ongoing harassment of Bengson, despite the fact that Defendant CSU knew or reasonably should have known that there was no plausible evidence supporting the claims that Bengson was a homicidal "campus shooter" type;

c.  Defendant CSU, by and through Velasquez-Andrade, constantly and publicly found fault with Plaintiff for attending some meetings remotely and for not meeting with students in person, even though CSU and Velasquez-Andrade knew that Plaintiff was excused from those activities based on his disability accommodation; and

d.  Defendant CSU, by and through Velasquez-Andrade, instructed students to demand to meet with Bengson in person even though she knew he was excused from doing so by the terms of his disability accommodation, with the intention and effect that Bengson experienced in person confrontations with said students that exacerbated his epilepsy symptoms.

154. Defendant CSU, by and through multiple administrators, knew that Velasquez-Andrade regularly critiqued Plaintiff for his failure to hold in-person office hours with students and his failure to appear in person at meetings, even though his disability accommodation allowed for this. For example, Velasquez-Andrade criticized Plaintiff in this manner to Interim Dean Buckley and Associate Vice President Roberts on multiple occasions, and they were present at a meeting where she confronted him with these alleged failures, but neither of these administrators ever corrected Velasquez-Andrade or asked her to stop verbally criticizing Plaintiff for his exercise of approved disability accommodations. As such, Defendant CSU, by and through Buckley and Roberts, ratified Velasquez-Andrade's attacks on Bengson for exercise of his disability accommodations.

155. The School of Social Sciences RTP Committee and Interim Dean Buckley both voted against retaining Bengson for a fifth probationary year, justifying their decisions on the

manufactured and retaliatory evidence of allegedly poor job performance that the departmental RTP Committee had produced and circulated, in documents that asserted Bengson had failed to perform his job duties because he had not appeared at certain in-person meetings and events— even though the University had excused him from attending those events in person by granting his disability accommodations.

156. Defendant CSU, by and through administrators and other employees, claimed that Plaintiff's non-verbal mannerisms, resulting from his partial deafness, were in fact evidence of his unprofessional conduct. Defendant CSU used these claims to justify disciplinary action against Plaintiff. Because of such allegations, Plaintiff was suspended with pay for three weeks, and later suspended without pay for an additional three weeks.

157. Defendant CSU failed to protect Plaintiff from the ongoing harassment, and instead encouraged further harassment by punishing Bengson for alleged aggressive actions, even though all evidence of this alleged aggression is based on mannerisms and voice volume levels that are direct effects of Plaintiff's partial deafness.

158. The harassment culminated in Defendant CSU denying Plaintiff tenure and promotion, which will necessarily lead to termination of his employment.

159. Plaintiff was harmed by the Defendant CSU's conduct, including emotional distress, humiliation, fear, loss of self-esteem, current and future financial losses, loss of career prospects and loss of career.

160. The fact that Plaintiff has been denied tenure will make it nearly impossible for him to secure another tenure-track position.

**COUNT THREE: DENIAL OF REASONABLE ACCOMMODATIONS OF DISABILITY (AGAINST DEFENDANT BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY ONLY)**

161. Plaintiff hereby reincorporates and realleges paragraphs 1-160 hereinabove, as if fully set forth herein.

162. The Board of Trustees of the California State University ("CSU") is an employer subject to the requirements of Title I of the Americans with Disabilities Act ("ADA").

163. The Plaintiff, Jesse Bengson, suffers from multiple conditions that limit multiple major life activities, including epilepsy and deafness in one ear. Bengson's co-workers and employer are aware of and/or have been informed of and should have been aware of his disabling medical conditions.

164. Defendant CSU employed Plaintiff and knew of Plaintiff's disabilities.

165. Plaintiff requested disability accommodations for Spring 2018 after experiencing a recurrence of epilepsy during Fall 2017, including a grand mal seizure he experienced in the SSU Psychology Department.

166. After participating in a good-faith interactive process with Senander and Velasquez-Andrade, Plaintiff received a disability accommodation for the Spring 2018 semester, which would allow him to avoid stressful, in-person interactions with students and faculty.

167. Subsequently, Plaintiff was constructively denied these accommodations in practice because Defendant CSU, by and through Velasquez-Andrade and Senander, sought to prevent him from exercising them.

168. Velasquez-Andrade and Senander violated Plaintiff's disability accommodation by seeking to undermine its basic features in the middle of the Spring 2018 semester, when they pressured Plaintiff to agree to an alteration of the accommodation's basic features. However, Defendant neither announced an end-date to the operative accommodations nor announced a new, interactive process, before pressuring Plaintiff to renegotiate.

169. Defendant CSU, by and through administrators including Buckley and Roberts, ratified Velasquez-Andrade's attacks on Bengson for exercising his disability accommodations.

170. Defendant CSU, by and through Velasquez-Andrade, Interim Chair Buckley, Associate Vice President Roberts and others, produced negative evaluations of Plaintiff's job performance, following his disability accommodation and his attempts to exercise his right to the accommodation. These negative evaluations specifically faulted Plaintiff for failing to perform duties and other activities from which he had been specifically excused by his disability accommodations. This series of negative evaluations ultimately led to denial of tenure and promotion, which will result in termination of Plaintiff's employment.

171. Plaintiff was harmed by Defendant CSU's conduct, including emotional distress, humiliation, fear, loss of self-esteem, current and future financial losses, loss of career prospects and loss of career.

## COUNT FOUR: RETALIATION FOR PROTECTED ACTIVITY UNDER THE ADA (AGAINST DEFENDANT BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY ONLY)

172. Plaintiff hereby reincorporates and realleges paragraphs 1-171 hereinabove, as if fully set forth herein.

173. The Board of Trustees of the California State University ("CSU") is an employer subject to the requirements of Title I of the Americans with Disabilities Act ("ADA").

174. The Plaintiff, Jesse Bengson, suffers from multiple conditions that limit multiple major life activities, including epilepsy and deafness in one ear. Bengson's co-workers and employer are aware of and/or have been informed of and should have been aware of his disabling medical conditions.

175. Defendant CSU employed Plaintiff and knew of Plaintiff's disabilities.

176. Plaintiff engaged in two protected activities under the ADA: requesting disability accommodations and attempting to exercise them.

177. Defendants subjected Plaintiff to multiple adverse employment actions that were motivated by Plaintiff's protected activity of requesting and attempting to use reasonable accommodations of his disability of epilepsy. These adverse employment actions include:

    a.   Creating a false narrative about Plaintiff's inadequate, pre-accommodation job performance;

    b.   Producing new job performance evaluations that specifically faulted Plaintiff for exercising his disability accommodations; and

    c.   Using these retaliatory evaluations to justify denying tenure and promotion to Plaintiff, which ultimately led to his termination.

178. Plaintiff's protected activity was the motivating reason for the adverse employment actions, as demonstrated when Bengson's colleagues expressed anger and resentment against Plaintiff because the accommodation of his disability allegedly resulted in their own increased workload.

179. Defendant CSU, by and through administrators including Buckley and Roberts, knew of Chair Velasquez-Andrade's frequent criticisms of Bengson for not appearing in person at meetings and events from which he was excused by the terms of his disability accommodation. Defendant CSU, by and through administrators including Buckley and Roberts, ratified and continued Velasquez-Andrade's attacks on Bengson for exercising his disability accommodations.

180. Plaintiff was harmed by Defendant CSU's retaliation, including emotional distress, humiliation, fear, loss of self-esteem, current and future financial losses, loss of career prospects and loss of career.

**COUNT FIVE: DEFAMATION PER SE**

**(AGAINST THE INDIVIDUAL DEFENDANTS—**

**VELASQUEZ-ANDRADE, BRASSINGTON, AND PAOLUCCI—**

**ONLY)**

181. Plaintiff hereby reincorporates and realleges paragraphs 1-135 hereinabove, as if fully set forth herein.

182. Defendant Brassington made unprivileged statements to Defendant Velasquez-Andrade about Plaintiff, asserting that Plaintiff was likely to become a "campus shooter" who would enact revenge on his colleagues if they denied him tenure.

183. Defendant Velasquez-Andrade understood that Brassington's statement was about Plaintiff and that Brassington meant to imply that Plaintiff had a criminal disposition and that he was likely to commit violent and criminal actions, including homicide.

184. Illustrating her belief in this defamatory statement, Velasquez-Andrade allegedly took actions to protect herself from Plaintiff's criminal nature, including removing all knives from the Psychology Department kitchen; becoming "hypersensitive to the noises in the office"; putting "an attachment on her door to block the light out, so no one knows when she is inside"; and carrying pepper spray and a large umbrella for some sense of protection when she leaves campus."

185. Defendant Brassington failed to use reasonable care to determine the truth or falsity of his defamatory statements, which were not based in fact.

186. Defendants Velasquez-Andrade and Paolucci also made unprivileged defamatory statements to multiple individuals, stating that Bengson was dangerous and a potential campus shooter. Velasquez-Andrade and Paolucci also failed to use reasonable care to determine the truth or falsity of their defamatory statements, which were not based in fact.

187. Velasquez-Andrade justified her fear of Plaintiff's non-verbal mannerisms by citing her expertise in working with infants, but on another occasion assured a staff member that Plaintiff's non-verbal mannerisms were merely a typical way for him to sit. This contradiction demonstrates Velasquez-Andrade's awareness that Bengson always sits in the same way, whether he is neutral, happy, angry, defensive, or otherwise, and that his manner of sitting was not a reasonable basis for fearing him.

188. Plaintiff suffered harm to his occupation, harm to his reputation, and feelings of shame and mortification as a result of Defendants' defamation and its consequences.

189. Damages can be assumed due to the intrinsically harmful nature of the statements, which were reasonable understood by listeners to mean that Bengson is a violent and dangerous person likely to engage in criminal actions up to and including homicide.

190. Punitive damages are justified against the Individual Defendants, because they acted with malice and oppression.

191. Specifically, defamatory attacks against Bengson for allegedly having a criminal nature were intended to justify denying him tenure, to punish Bengson because his disability accommodation allegedly resulted in increased workload for the Individual Defendants. For example, when interviewed, Defendant Brassington spoke about Plaintiff's allegedly criminal nature almost simultaneously with airing his complaints about Plaintiff's role in increasing Defendant Brassington's workload.

**COUNT SIX: DEFAMATION**

**(AGAINST THE INDIVIDUAL DEFENDANTS—**

**VELASQUEZ-ANDRADE, BRASSINGTON, AND PAULUCCI—**

**ONLY)**

192. Plaintiff hereby reincorporates and realleges paragraphs 1-135 and 181-191 hereinabove, as if fully set forth herein.

193. Defendants Brassington, Paolucci and Velasquez-Andrade made false unprivileged statements of purported facts about Plaintiff, to multiple individuals, asserting that Plaintiff was criminally dangerous, a potential campus shooter, and was disposed to violence. Persons to whom these statements were made (including Velasquez-Andrade) reasonably understood the statements to be about Bengson and reasonably understood the statements to mean that Bengson was a criminally dangerous individual, that Bengson was dangerous to interact with, and that Bengson was liable to engage in violence.

194. Defendant Brassington stated that Bengson created an unsafe environment at SSU because he tended to "smirk, stare coldly, raise his eyebrows and smile in a condescending fashion," and that he allegedly failed to respond to "hellos" in the hallway.

195. Defendant Paolucci claimed it was likely that Plaintiff would become a campus shooter, not because Plaintiff made physical or verbal threats, but because Paolucci—a social psychologist with expertise in aggression—identified risk factors for aggression in Plaintiff, including alienation, a sense of entitlement, failure, masculinity, and projection. Paolucci further compared Plaintiff with former serial killers by describing Bengson's rebuttal to Paolucci's Minority Report as sounding like a "manifesto" and thus making Paolucci feel that his "safety was in jeopardy."

196. Defendants made the defamatory statements negligently, recklessly, or with intent to communicate a false statement.

197. As a result of the defamatory statements, co-workers of Bengson viewed him with fear. For example, SSU employee Cara Stevens claimed she was afraid Plaintiff would become a campus shooter because he feared being denied tenure. Stevens said that she was afraid because Plaintiff's situation reminded her of other individuals who took vigilante action to avenge their tenure denials. Upon information and belief, Stevens and other SSU

employees experienced fear that Bengson would engage in homicide as a direct result of the defamatory publications by Brassington, Velasquez-Andrade and Paolucci.

198. Plaintiff suffered harm to his occupation, harm to his reputation, and feelings of shame and mortification as a result of Defendants' defamation and its consequences.

199. Punitive damages are justified against the Individual Defendants, because they acted with malice and oppression.

**WHEREFORE,** Plaintiff humbly prays this honorable Court for relief as follows:

    a.  **From Defendant Board of Trustees of the California State University**

        1.  Compensatory damages;

        2.  Reinstatement with tenure and promotion to the rank of Associate Professor;

        3.  Front pay;

        4.  Back pay; and

        5.  Such other and further relief as the Court considers proper.

    b.  **From the Individual Defendants**

        1.  Compensatory damages;

        2.  Assumed damages;

        3.  Punitive or exemplary damages; and

        4.  Such other and further relief as the Court considers proper.

### JURY DEMAND

Plaintiff demands trial by jury as to all causes of action herein so triable.

Respectfully submitted,

Dated: July 20, 2020

<u>/s/ Stanley Apps</u>

Stanley R. Apps

Attorney for Plaintiff Jesse Bengson